UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| **LLOG EXPLORATION COMPANY, L.L.C.,**<br>    **Plaintiff** | **CIVIL ACTION** |
| **VERSUS** | **NO. 14-2791** |
| **SIGNET MARITIME CORPORATION, INC.,**<br>    **Defendant** | **SECTION: "E" (3)** |

**FINDINGS OF FACT AND CONCLUSIONS OF LAW**

This matter involves a dispute between the parties to a maritime towing contract. The contract was entered into by LLOG Exploration Company, L.L.C. ("LLOG"), and Signet Maritime Corporation ("Signet"). On December 10, 2014, LLOG filed a Complaint for Declaratory Judgment against Signet, seeking a declaration of its rights and liabilities under the contract.[1] Signet thereafter filed a counterclaim against LLOG for breach of contract.[2]

This matter was tried before the Court, sitting without a jury, over two days. Having considered the evidence admitted at trial and the arguments of counsel, the Court announces its Findings of Fact and Conclusions of Law pursuant to Rule 52 of the Federal Rules of Civil Procedure. To the extent a finding of fact constitutes a conclusion of law, the Court adopts it as such. To the extent a conclusion of law constitutes a finding of fact, the Court adopts it as such.

---

[1] R. Doc. 1.
[2] R. Doc. 11.

# **FINDINGS OF FACT**

## I. JURISDICTION

1. The Court has jurisdiction under the Admiralty and Maritime laws of the United States, 28 U.S.C. § 1333, and Rule 9(h) of the Federal Rules of Civil Procedure. Alternatively, diversity of citizenship is present and the requisite amount in controversy is satisfied. Thus, federal jurisdiction is also proper under 28 U.S.C. § 1332.

## II. THE COMPLAINT & COUNTERCLAIM

2. On December 10, 2014, LLOG filed a Complaint for Declaratory Judgment,[3] regarding the obligations of the parties under certain contractual documents. The Complaint specifically sought a declaration that LLOG did not owe Signet the "postponement fee" in the amount of $650,496.00, which had been invoiced by Signet.[4]

3. On January 21, 2015, Signet filed its Answer and Counterclaim, generally denying the allegations of the Complaint and asserting a Counterclaim for "standby" damages under the applicable contract documents in the total amount of $3,322,368.00.[5]

## III. THE CONTRACT DOCUMENTS & PRINCIPAL TERMS

4. In January 2014, LLOG issued a Request for Quote ("RFQ") for assistance in towing its DELTA HOUSE structure, an offshore floating production facility,

---

[3] R. Doc. 1.
[4] *See* Exh. 19.
[5] R. Doc. 11.

2

from the Kiewit Offshore Services Shipyard in Ingleside, Texas, to the Aransas Pass sea buoy.[6]

5. On February 11, 2014, Signet submitted a proposal in response to LLOG's RFQ.[7] This proposal was a comprehensive bid package, including, *inter alia*, the identification of the five Signet vessels that would perform the tow services for LLOG and the rates for those vessels. The proposal also included standby rates for Signet's vessels in the event the tow was delayed.

6. On April 14-15, 2014, LLOG and Signet executed a Blanket Time Charter Agreement with respect to LLOG's DELTA HOUSE tow-out project.[8]

7. Thereafter, Jason Miura, Signet's Manager for Chartering and Business Development, and Mark Farrow, an Offshore Construction Manager for LLOG, exchanged a series of emails concerning the terms of Signet's proposal.[9] This exchange culminated in Miura's May 21, 2014 email to Farrow, in which Miura confirmed the terms of the parties' agreement.[10]

8. LLOG and Signet entered into a contract pertaining to the tow of the DELTA HOUSE.

9. The contract consists of four (4) documents:

   a. LLOG's Request for Quote ("RFQ") dated January 2014;[11]

   b. Signet's Response to RFQ dated February 11, 2014;[12]

---

[6] Exh. 2.
[7] Exh. 3.
[8] Exh. 1.
[9] Exhs. 91, 92; Testimony of Mark Farrow; Testimony of Jason Miura.
[10] Exh. 4.
[11] Exh. 2.
[12] Exh. 3.

    c. A Blanket Time Charter Agreement dated April 14-15, 2014;[13] and

    d. An email from Miura to Farrow dated May 21, 2014 (sometimes referred to hereinafter, collectively, as the "Contract").[14]

10. Pursuant to the Contract, Signet was responsible for the inshore towage of LLOG's DELTA HOUSE structure from the Kiewit Offshore Services Shipyard in Ingleside, Texas, to the Aransas Pass sea buoy. Offshore towage from the Aransas Pass sea buoy to the final position for the DELTA HOUSE in the Gulf of Mexico was contracted to Crowley Maritime Services ("Crowley").

11. The terms of the Contract included in the May 21st email read, specifically, as follows:

    a. 4 Days minimum per Large Tractor Tug at $33,600 per day per vessel.

    b. 1 Day minimum for SIGNET VOLUNTEER at $28,800 per day (removed 4 day minimum).

    c. 7 days minimum notice of sail date.

    d. Plus fuel surcharge.

    e. Plus Overtime for Sundays and Holidays (removed Saturdays).

    f. Standby rate – After the 4 days minimum firm period, 60% of the full charter hire per day (no surcharges) applicable until 0001 day of tow, at which time full charter hire plus surcharges recommences pro rata until vessels return to the Signet dock.

    g. Postponement – 4 Days minimum firm period plus surcharges payable, a new 7 days of notice to be declared by LLOG, additional 4 Days firm plus

---

[13] Exh. 1.
[14] Exh. 4.

> surcharges payable, standby clause above applicable beyond the 2nd 4 Day firm period.

12. The Contract required that LLOG provide Signet a minimum of 7 days' notice of the designated sail date ("Seven Day Notice").[15] That is, LLOG was required to notify Signet of the nominated[16] sail date at least 7 days in advance of that date. The Contract did not require a certain form for the Seven Day Notice.[17]

13. The Contract did not require that LLOG designate a certain, presumably longer, window during which it would give notice of the sail date. In preliminary contract discussions, Signet suggested that the Contract include a notification window during which LLOG would be required to nominate a sail date.[18] LLOG refused.[19] Mark Farrow explained that windows typically do not benefit the customer, in this case LLOG, because when there is a window the customer is required to declare the sail date farther in advance.[20] Because of the uncertainties involved, this increases the risk that the customer will not sail during the window and will, as a result, face some type of penalty.[21] For that reason, LLOG eventually suggested via email that the parties "proceed without nominating a window."[22] Signet agreed, and the May 21st email included only the Seven Day Notice provision. LLOG's contract with Crowley, however, did include notification windows.[23]

---

[15] Exh. 4.
[16] The parties refer to the designation of a sail date as a "nomination." The Court thus also uses the term throughout.
[17] Testimony of Mark Farrow.
[18] *See* Exh. 4.
[19] Testimony of Mark Farrow.
[20] Testimony of Mark Farrow.
[21] Testimony of Mark Farrow.
[22] *See* Exh. 4.
[23] Testimony of Mark Farrow.

5

14. In the May 21st email, LLOG agreed it would pay a minimum of 4 days' charges for each tug, even if Signet's portion of the tow took fewer than 4 days to complete.[24] The DELTA HOUSE tow-out was only projected to take 12 hours to complete. Once the Seven Day Notice was given to LLOG, LLOG was contractually obligated to pay Signet a minimum of 4 days' charges for each vessel.

15. Once LLOG gave the Seven Day Notice, the terms of the May 21st email required LLOG, in the event the sail date was delayed beyond the 4-day minimum period detailed above, to pay either the standby rate or postponement fees during the delay and to pay the full daily charges when the tow occurred.[25] If such a delay occurred, LLOG had the right to elect to pay, at its option, *either* the standby rate *or* the postponement fee.[26]

16. The Contract, specifically the Blanket Time Charter, allows the prevailing party to recover its attorneys' fees, court costs, and other defense costs.[27]

IV. PRE-TOW CORRESPONDENCE

17. On July 15, 2014, LLOG instructed the "tow team,"[28] via email, that "all tow related activities need to be ready for August 4th."[29] Signet relies on this email as

---

[24] Exh. 4.
[25] Exh. 4. As explained *infra*, however, the actual tow-out of the DELTA HOUSE was only delayed for 1 day beyond the required 4-day minimum period. The Contract required LLOG to pay, in the event of a 1-day delay, the full daily charges for that additional day.
[26] Testimony of Mark Farrow; Exh. 4.
[27] Exh. 1.
[28] The "tow team" was comprised of all of the entities involved in the complicated tow-out project of LLOG's DELTA HOUSE structure. For example, the "tow team" included Crowley, Signet, Kiewit, Exmar Offshore, Global Maritime, Fugro World Wide, and Matthews Daniel, among others. Exh. 9; Testimony of Mark Farrow. Signet's role as a member of the tow team was to provide advance notice to the Coast Guard of the DELTA HOUSE tow-out so as to coordinate the necessary channel closure. Testimony of Mark Farrow; Testimony of J. Barry Snyder; Testimony of Jason Miura.
[29] Exh. 9.

notification of an August 4th sail date, which it contends triggered either postponement fees or the standby rate in the event the tow did not occur. The full text of the LLOG email reads:

> "Folks,
>
> The tow out window has been narrowed from August 4th to August 17th with anticipation we will sail at the front end of the window. All tow related activities need to be ready for August 4th. Tabitha has been notified and she will be modifying the channel closure with the USCG accordingly.
>
> Please let me know if you have any questions or concerns.
>
> Sincerely,
>
> Mark Farrow"[30]

18. The phrase "all tow related activities" is not defined in the Contract, nor does the phrase have an "industry standard" definition.[31]

19. Signet interprets the phrase "all tow related activities need to be ready for August 4th" to mean the Signet tugs had to be ready to tow the DELTA HOUSE on August 4th.[32] According to Signet, the tow-out was not possible without Signet's tugs, so "all tow related activities need to be ready for August 4th" necessarily meant having its tugs ready to perform the tow-out on August 4th.[33]

20. LLOG, however, maintains that the phrase "all tow related activities need to be ready for August 4th" refers not to Signet's tugs being ready to tow the DELTA HOUSE on August 4th but to tow bridles, tow gear, tow inspections, marine surveys, and other miscellaneous pre-tow activities being complete.[34]

---

[30] Exh. 9.
[31] *See* Exhs. 1, 2, 3, 4; Testimony of Mark Farrow.
[32] Testimony of Mark Farrow; Testimony of J. Barry Snyder; Testimony of Jason Miura; Exh. 25.
[33] Testimony of J. Barry Snyder.
[34] Testimony of Mark Farrow; Exh. 11.

21. The Court finds, based on the totality of the evidence and the testimony presented at trial, that the phrase "all tow related activities" referred to various miscellaneous pre-tow activities and did not constitute the Seven Day Notice. Accordingly, the Signet tugs did not have to be ready to tow the DELTA HOUSE on August 4th.

22. J. Barry Snyder, the President and Chief Executive Officer of Signet, admitted on cross-examination that some tow-related activities can be performed without tugs.[35] Furthermore, Snyder was pressed on cross-examination as to why, if the phrase imposed an obligation on Signet to have its tugs ready to tow the DELTA HOUSE on August 4th, LLOG provided a window within which the tow might take place.[36] Snyder failed to provide a convincing response.

23. The July 15th email was not a Seven Day Notice to Signet of an August 4th sail date. Significantly, the Court notes that LLOG did not send the July 15th email to Jason Miura, a Signet manager and the principal contact with LLOG on the Contract.[37] Mark Farrow of LLOG testified at trial that, had the July 15th email been the Seven Day Notice, the email would have been sent to Miura.[38] When LLOG subsequently sent the Seven Day Notice of a September 10th sail date, Miura was a recipient of the notification email.[39]

24. Had Mark Farrow intended the July 15th email to be the Seven Day Notice of an August 4th sail date, the email would have included the language "sail date" or

---

[35] Testimony of J. Barry Snyder.
[36] Testimony of J. Barry Snyder.
[37] *See* Exh. 9.
[38] Testimony of Mark Farrow.
[39] Exh. 87.

8

something similar so as to avoid any confusion.[40] In fact, on September 3rd when Farrow subsequently sent the Seven Day Notice of a September 10th sail date, he stated that LLOG had "tentatively set the tow out of Delta House for next Wednesday, September 10th."[41] Such language is certainly clearer and more precise than that contained in the July 15th email and leaves no doubt as to the sail date that LLOG selected.

25. Signet never acknowledged the July 15th email or communicated to LLOG that its tugs would be in the harbor, ready to sail on August 4th. Signet did not respond to LLOG's July 15th email.[42] However, when Signet later received the Seven Day Notice on September 3rd for a September 10th sail date, Signet did respond to the email and confirmed that its tugs would be ready to perform on the 10th.[43]

26. Signet argued throughout this litigation that, because the July 15th email was the Seven Day Notice of an August 4th sail date, LLOG became contractually obligated to pay Signet either the standby rate or postponement fees under the Contract when LLOG failed to sail on August 4th.[44] However, when it first became clear that LLOG would not sail on August 4th, Signet made no request for payment of either the standby rate or postponement fees. Signet did not ask whether LLOG elected to pay the standby rate or postponement fees, nor did Signet notify LLOG that LLOG was, in Signet's opinion, liable for these fees.

---

[40] Testimony of Mark Farrow.
[41] Exh. 87.
[42] Testimony of J. Barry Snyder; Testimony of Jason Miura.
[43] Exh. 19.
[44] *See, e.g.*, R. Doc. 74 at 12 ("Accordingly, because LLOG's July 15, 2014 notice to Signet put Signet's vessels on "standby" under the contract, LLOG owes Signet $3,322,368.00 in damages based upon the "standby rate" in the parties' contract.").

Instead, after September 10th, Signet sent an invoice for 5 days (the 4 day minimum plus the 1 day on which the tow-out took place).[45]

27. The July 15th email did not require Signet to be ready to sail on August 4th, but instead merely advised Crowley that the *window* during which the tow-out *might* commence under the Crowley contract had been narrowed to the period of August 4th to August 17th.[46] Windows were contractually irrelevant to Signet.[47] Signet was made aware of the window set by LLOG with respect to Crowley as a courtesy.

28. Certain emails, which were entered into evidence, confirm that Signet anticipated LLOG would subsequently nominate a *specific* sail date and give a Seven Day Notice of that sail date. For example, on July 14, 2014, Jason Miura of Signet notified LLOG via email that Signet would "nominate final performing vessels when [LLOG] nominate[s] the sail date."[48] When Miura authored and sent this email, he already knew that LLOG had designated a window of August 4th to August 17th under the Crowley contract.[49] The July 14th email clearly shows that, even after receiving notice of the August 4th to August 17th Crowley window, Signet knew there would be a subsequent nomination and a Seven Day Notice of a specific sail date.

---

[45] *See* Exh. 50.
[46] As stated above, LLOG's contract with Crowley Maritime Services, the company responsible for the offshore portion of the DELTA HOUSE tow, included windows. Thus, LLOG's provision of windows to Crowley is consistent with the contract between LLOG and Crowley; any windows to which Signet became privy were, as found by the Court herein, contractually inconsequential to Signet.
[47] Testimony of Mark Farrow; Testimony of J. Barry Snyder.
[48] Exh. 28.
[49] Miura testified that, prior to LLOG sending the July 15th email, LLOG probably communicated that information to Crowley, as well as to Tabitha Brown with Signet so she could notify the Coast Guard. Testimony of Jason Miura. Thus, although Miura could not remember specifically, he testified that he likely learned of the window from either Crowley or Tabitha Brown, but, in any case, he was aware of it on July 14th.

29. Furthermore, in an email to Wesley Winchester, a Signet manager, on July 18, 2014, Miura again confirmed his understanding that LLOG would, at some time in the future, nominate a "final" sail date.[50] Miura wrote: "We have request [sic] the final tug spread to be nominated when LLOG nominates their final sail away."[51]

30. As early as July 28, 2014, Signet was aware it would receive notice of a final sail date from LLOG. On July 28th, Miura authored an email to a number of his Signet counterparts. In this email, Miura again recognized that LLOG would, at some point in the future, nominate a final sail date.[52] This July 28th email was sent exactly 7 days prior to the alleged August 4th sail date. If Signet truly believed, as it has alleged throughout this litigation, that August 4th was the final sail date, there would be no need on July 28th to await a final sail date nomination from LLOG. However, this July 28th email evidences exactly the opposite—the August 4th date was merely the beginning of a window under the Crowley contract, not the Seven Day Notice under the Contract with Signet.

31. On July 29, 2014, LLOG notified the "tow team" that the tow-out would likely take place near the end of the August 4th to August 17th window, probably sometime around August 15th.[53] Signet did not respond to this email or otherwise object to the possibility of the sail commencing after August 4th, the date Signet alleged at trial was the final sail date.[54]

---

[50] Exh. 77.
[51] Exh. 77.
[52] Exh. 78.
[53] Exh. 11.
[54] Testimony of J. Barry Snyder.

11

32. The July 29th email also stated that "all tow related activities" were complete. It then defined "tow related activities" as "tow gear ordered and delivered, tow manual and EEP [Emergency Evacuation Plan] complete."[55] The July 29th email clearly defined "all tow related activities" and did not include Signet's tugs being ready to tow the DELTA HOUSE in the definition.

33. Signet was in contact with Kiewit Offshore Services in Ingleside about the status of Kiewit's pre-tow, preparatory work on the DELTA HOUSE. Immediately after receiving the July 29th email from LLOG, Signet contacted Kiewit via email, inquiring into the "likelihood" of LLOG "slipping past" its August 17th date.[56] Kiewit responded: "At this point I'd give it a 50/50 unfortunately."[57] This correspondence with Kiewit shows Signet did not anticipate an August 4th sail date. Signet's position in this litigation, *i.e.*, that the July 15th email was the Seven Day Notice of an August 4th sail date, is inconsistent with its July 29th email to Kiewit.

34. On August 6, 2014, LLOG notified the "tow team," again via email, that the tow-out window had been revised to August 29th through September 12th.[58] Importantly, this email does not state that the "sail date," "sail away," or "tow-out" was being changed. Rather, it states only that LLOG was changing the *window* within which the sail away or tow-out might take place.

35. Two days later, on August 8th, Miura emailed LLOG to discuss the "change in plans."[59] Mark Farrow testified at trial that he interpreted Signet's August 8th

---

[55] Exh. 11.
[56] Exh. 76.
[57] Exh. 76.
[58] Exh. 12.
[59] Exh. 14.

email to convey Signet's position that, because of the "change in plans," LLOG owed Signet either postponement or standby fees.[60] The parties then spoke via telephone, and Miura raised the postponement fee for the first time.[61]

36. On August 13, 2014, Miura again emailed LLOG, stating "LLOG's declaration of a 14-day window created a firm commitment during which LLOG would ultimately be allowed to declare the sail date. Furthermore, Signet followed [LLOG's] written instruction and took all steps necessary to have all tow related activities ready for August 4th."[62] However, LLOG's declaration of the August 4th to August 17th window under the Crowley contract had no bearing on Signet's duty to perform under the Contract with Signet.

## V. THE TOW

37. On September 3, 2014, LLOG gave the Seven Day Notice of a September 10, 2014 sail date.[63] Signet confirmed receipt of the September 3rd email and assured LLOG it would be ready to sail on September 10th.[64]

38. The tow did not commence on September 10, 2014. Instead, Signet towed the DELTA HOUSE on September 14, 2014, using four Signet tugs—the Signet Magic, the Signet Weatherly, the Signet Reliance, and the Signet Enterprise.[65] The inshore tow lasted about 12 hours. Signet completed the tow and otherwise met all of its material obligations under the Contract.

---

[60] Testimony of Mark Farrow; Exh. 104.
[61] Testimony of Mark Farrow; Testimony of Jason Miura; Exh. 15.
[62] Exh. 15.
[63] Exh. 18.
[64] Exh. 19.
[65] Exh. 21. *See also* Exh. 24; Testimony of Mark Farrow; Testimony of Jason Miura.

39. As stated above, the Contract required LLOG to pay 4 days *minimum* of daily charges.[66] Because the tow did not commence until September 14th, however, LLOG paid Signet for 5 days of daily charges—4 days minimum (September 10, 11, 12, and 13); plus one day (September 14)—totaling $912,096.00 for the inshore tow-out.[67] Signet does not dispute that it invoiced this amount or that LLOG paid this amount. However, Signet claims it is also entitled to either standby charges or postponement fees.

40. On September 3, 2014, Signet sent to LLOG Invoice No. 516374[68] in the amount of $650,496.00 for postponement fees amounting to 4 days of daily charges.

41. After LLOG filed suit, Signet demanded payment under the "standby rate" provision in the Contract from August 4th through September 9th in the amount of $3,322,368.00.[69]

42. LLOG did not pay Signet Invoice No. 516374 for the postponement fee charges, nor did LLOG pay standby charges to Signet.

## CONCLUSIONS OF LAW

1. The construction of a maritime contract is normally governed by federal, general maritime law, rather than state law. *See, e.g., Albany Ins. Co v. Anh Thi Kieu*, 927 F.2d 882, 886 (5th Cir. 1991); *Halliburton Co. v. Norton Drilling Co.*, 302 F.2d 431 (5th Cir. 1962), *cert. denied*, 374 U.S. 829 (1963).

2. Words in maritime contracts are to be given their plain, literal meaning. *Robin v. Sun Oil Co.*, 548 F.2d 554, 557 (5th Cir. 1977) (citing *Independent Oil Workers*

---

[66] Exh. 4.
[67] Exh. 50.
[68] The Invoice is dated August 18, 2014, but Signet did not forward the Invoice to LLOG until September 3, 2014. *See* Exh. 19.
[69] R. Doc. 11; Exh. 111.

14

      v. *Mobil Oil Corp.*, 441 F.2d 651, 653 (3d Cir. 1971); *Aetna Cas. & Sur. v. Crawford*, 370 F.2d 917, 918 (5th Cir. 1967); *Employing Lithographers v. N.L.R.B.*, 301 F.2d 20, 28 (5th Cir. 1962)).

3. Courts may not ordinarily look beyond the written language of a contract, unless the contractual provisions are ambiguous. *Corbitt v. Diamond M. Drilling Co.*, 654 F.2d 329, 332–33 (5th Cir. 1981); *Har-Win, Inc. v. Consol. Grain & Barge Co.*, 794 F.2d 985, 987 (5th Cir. 1986).

4. "Disagreement as to the meaning of a contract does not make it ambiguous, nor does uncertainty or lack of clarity in the language chosen by the parties." *Breaux v. Halliburton Energy Servs.*, 562 F.3d 358, 364 (5th Cir. 2009) (quoting *Weir v. Fed. Asset Disposition Ass'n*, 123 F.3d 281, 286 (5th Cir. 1997)) (internal quotation marks omitted).

5. In this case, the Contract between LLOG and Signet is not ambiguous. Under the Contract, and specifically the May 21st email, LLOG owed Signet 7 days' notice of the final sail date.

6. Signet had the burden of proving, by a preponderance of the evidence, that LLOG breached the Contract. Signet has not carried its burden.

7. LLOG gave 7 days' notice on September 3, 2014, for a final sail date of September 10, 2014.

8. The sail commenced on September 14, 2014.

9. LLOG paid Signet the invoiced amount of $912,096.00.[70]

10. LLOG paid to Signet all that Signet was owed for its services under the Contract.

---

[70] Exh. 50.

11. LLOG is entitled to declaratory judgment that it does not owe Signet either postponement fees or standby charges under the Contract.

12. Signet is not entitled to recover, under its counterclaim, either postponement fees or standby charges.

13. The prevailing party may recover attorneys' fees only when provided for by contract or statute. *See, e.g.*, *Galveston Cnty. Nav. Dist. No. 1 v. Hopson Towing Co., Inc.*, 92 F.3d 353, 356 (5th Cir. 1996). As the prevailing party in this action, LLOG is entitled to recover all reasonable attorneys' fees, court costs, and other defense costs from Signet pursuant to Paragraph 29 of the Contract.[71]

14. The Court bifurcated the issue of the specific amount of attorneys' fees from the trial as to liability.[72]

## **CONCLUSION**

For the foregoing reasons, **IT IS ORDERED** that judgment be entered in favor of LLOG Exploration Company, L.L.C., and against Signet Maritime Corporation on LLOG's Complaint for Declaratory Judgment.

**IT IS FURTHER ORDERED** that judgment be entered in favor of LLOG Exploration Company, L.L.C., and against Signet Maritime Corporation on Signet's Counterclaim.

**IT IS FURTHER ORDERED** that judgment be entered in favor of LLOG and against Signet for attorneys' fees, court costs, and other defense costs, in accordance with

---

[71] Exh. 1.
[72] R. Doc. 46.

Paragraph 29 of the Contract.[73] LLOG is given 14 days from this date to submit competent evidence supporting its claim. Signet is given 14 days from that date to file its opposition.

**New Orleans, Louisiana, this 1st day of December, 2015.**

                                      _____
                                          **SUSIE MORGAN**
                             **UNITED STATES DISTRICT JUDGE**

---

[73] *See* Exh. 1.